We will hear argument first this morning in Case 24-539, Chiles v. Salazar. Mr. Campbell. Thank you, Mr. Chief Justice, and may it please the Court. Colorado forbids counselors like Kaylee Chiles from helping minors pursue state-disfavored goals on issues of gender and sexuality. This law prophylactically bans voluntary conversations, censoring widely held views on debated moral, religious, and scientific questions. Aside from this law and recent ones like it, Colorado hasn't identified any similar viewpoint-based bans on counseling. These laws are historic outliers. In NIFLA, this Court protected professional speech, highlighting the dangers of censoring private conversations between professionals and their clients. And this Court rejected by name two lower court decisions upholding laws like Colorado's. But the Tenth Circuit gutted NIFLA's speech protection. Colorado insists that its law is subject only to rational basis review. Yet that would allow states to silence all kinds of speech in the counseling room, such as disfavored views on divorce or abortion. If heightened scrutiny doesn't apply, states can transform counselors into mouthpieces for the government. Here, Colorado can't satisfy any level of heightened scrutiny. It didn't seriously consider any less restrictive alternatives, and Colorado can't prove harm because it hasn't cited a study focusing on what's at issue here, voluntary speech between a licensed professional and a minor. Nor can Colorado deny that many people have experienced life-changing benefits from the kind of counseling that Ms. Childs wants to provide. The First Amendment doesn't permit Colorado's censorship. I welcome the Court's questions. In its introduction of its brief, Colorado says that the only thing that the law prohibits therapists from doing is performing a treatment that seeks to predetermine the outcome of changing a minor's sexual orientation or gender identity because the treatment is unsafe and ineffective. One, is this what Colorado argued below? And two, is that your reading of the Colorado statute? Colorado took a different position below in its motion to dismiss specifically footnote 3 and on page 10 of its opposition to the motion for preliminary injunction. It recognized that efforts to change unwanted same-sex behavior or to reduce unwanted same-sex attraction would indeed violate the law, and that's contrary to the position it's taking now. I do think if we look at the plain language of the statute, we will find that what Ms. Childs alleges in this case falls squarely within it. The statute says that there can be no efforts to change sexual orientation or gender identity, including efforts to change behavior, gender expression, or attraction. On page 207 of the petition appendix, Ms. Childs alleges in her verified complaint that sometimes she helps clients who want to reduce unwanted same-sex attraction, change unwanted same-sex behavior, and to resolve dysphoria that they're experiencing with their body. Counsel, you are right that that fits the definition of the law, but we have been very clear in Susan B. Anthony that there has to be a sufficiently eminent and credible threat of prosecution. We've said merely having a law on the books is not enough. A chilling effect doesn't exist. This is an unusual case because we have basically six years of no enforcement of this law, three before this lawsuit, three since, and we have the entity charged with administering the law saying, we're not going to apply it to your kind of therapy. So how does that fit into being an eminent threat of prosecution? Yes, you have an argument. They've disavowed it. How does that give you standing? I don't believe that the state has disavowed enforcement. The state is relying on a misreading of the allegations in this case to say that there's no standing, but they have not disavowed enforcement. If Colorado truly believed that it wouldn't enforce the law and that Ms. Childs wasn't- All right, so tell me what kind of disavowal you would need to find no standing. Would it be sufficient to say that consent, which is what's your complaint claim, that your therapy is consensual talk therapy, where you would seek to change the behavior of a child only if that's what they want, correct? Am I articulating it correctly? That is certainly an aspect of what Ms. Childs- Okay, I don't want an aspect. Define your talk therapy, and then when they get up, they can tell us whether they're disavowing any enforcement of that kind of talk therapy. I would go back to what I referenced before, which is petition appendix page 207. Counselor, please answer my question. I am trying to answer your question. What is your talk therapy that you want them to say they will not enforce it against? Ms. Childs helps clients when their goals are to resolve gender dysphoria by getting comfortable with their body and realigning their identity with their sex. She also helps them if they're experiencing unwanted same-sex attraction. If that's their goal, to reduce it. And she helps them deal with issues of unwanted same-sex behavior. That's the kind of counseling that we've alleged in the complaint. And here- Would any of that include what's talked about as aversion therapy, which is encouraging them to vomit, encouraging them to go into electric shock treatment, encouraging the typical aversion to therapy? No, Ms. Childs does not do any of that. All she does is speech in her counseling. So what behavior does that include? Does that include date other people of the opposite sex? No, that's not the kind of counseling she engages in. She engages in a discussion where her and the client explore the concepts of identity- So go back to my last part of my question. If they disavow enforcement of that kind of talk therapy, do you have standing in this case? We still have standing in this case. Over the last few weeks, there have been anonymous complaints filed against my client, and those complaints are now being investigated by the state of Colorado for allegations that she's violating the very law that we're challenging. So we had a credible threat of enforcement before because there's no disavowal. Anyone can file a complaint at any time which this court recognizes bolsters a credible threat of enforcement and SBA list. But now that the state is actively investigating our client for supposedly violating this law- Okay, we're in a vicious cycle because if they get up here and say they're disavowing, then they won't be investigating. But regardless, if they disavow, it's only based on not only a misreading of the statute but also a misreading of the allegations in the complaint. As we pointed out in our reply brief, there are often uses of portions of quotes, and the state of Colorado is ignoring the rest of the sentences in the allegations. Once those are read, just as the lower courts found, there is standing in this case. Counsel, how does your position change if, in addition to the counseling, there is more what I'll call medical treatment, whether it's medications, shots, whatever? Does that alter your position? It certainly does alter our position. As this court talked about in NIFLA, when speech is incidental to regulated conduct, then that changes the analysis. If we were in the medical context and there was something like administering drugs, performing procedures, conducting examinations, that would take it outside of the arguments we're making. How about if it's just both? In other words, the speech isn't incidental to giving somebody a prescription for medicine. It's speech and it's giving somebody a prescription for medicine. It would depend on how closely connected they are. So if the speech is describing how to take the medication, then that would be incidental. Right, but if the speech is the speech that your client engages in, and, in addition, she engages in something that's non-speech, would we look at it separately or would we look at it as a package? If they're sufficiently disconnected, I think you would look at them separately. And my client doesn't have the authority to prescribe drugs because she's not a psychiatrist. And the state of Colorado recognizes that there's a very big difference because it treats psychiatrists under Section 240 of the code and it treats counselors under 245, and that's a recognition that it's just different regulation when medicine is at issue. In this case, Colorado is violating the promise that this court laid out in NIFLA, which is that states should not manipulate private conversations between licensed professionals and clients. Beyond that, this applies to a malpractice suit. Let's say that we think that this is content discrimination and it triggers strict scrutiny. Would your client then be subject to a malpractice suit? She would be subject to a malpractice suit, but she would have the protection of the rigorous elements of malpractice. She would be able to show that she's not violating the standard of care, that she would be able to establish what the standard of care is. She would be able to show there's no harm and there's no causation. Well, I assume there would be a battle about the standard of care with competing experts, competing medical associations. Colorado has pointed to some professional associations in this case. Would the First Amendment have anything to say about that? I mean, would it be strict scrutiny? I mean, it's the elements of a tort. It's a different thing. We didn't get to this question in this matter. As a general matter, the elements of a malpractice suit are sufficient to protect freedom of speech. Now, I'm not willing to foreclose the fact that there might not be an argument someone might make in a particular malpractice case, but for our purposes, the elements of malpractice are generally sufficient to protect free speech. And in this case, the court doesn't need to resolve whether there might be additional protection because the way that Colorado is using malpractice is as an analog to what it's doing here. But it's nothing like the law that we're trying to... Well, I wasn't actually asking about the analog argument. I was just asking it independently. Can I just ask you to say on page 18 of your reply brief that in fact a malpractice suit could go forward and completely separate from the First Amendment that what you need to prove a malpractice suit provides sufficient protection. Is that a right reading of what you said? It is a right reading, although we said that those elements are generally sufficient. So I don't want to foreclose that in a particular case there might be an argument, but generally speaking, a malpractice action subject to the rigorous elements would be sufficient to protect free speech. Can I get you to address whether or not the provision of therapy and the kind of therapy that your client practices is a medical treatment? I mean, I understood the sort of basis of the Tenth Circuit's view to be that she's a licensed professional who is providing medical treatment, but your answers to the Chief Justice and Justice Kagan suggested that you're putting the practice of medicine on one side and her therapy on another. So I'm just unclear as to whether or not you're categorizing her therapy as a medical treatment. I don't believe that we are categorizing it that way, but I don't think it matters, because the First Amendment depends on the difference between speech and conduct, not on the difference between treatment and non-treatment. So in my response to the Chief Justice... But I guess the argument that the Tenth Circuit seemed to find persuasive was that if you are in the world of medical treatment, you are regulating conduct, that the medical treatment itself is an activity that is being licensed and that is being performed and that it really isn't speech, that speech is the tool that is being used, just like in other medical treatments you have scalpels, you have tools that medical professionals use to accomplish certain goals and to provide treatment. And so in that sense, I think their argument was that speech is incidental to the provision of this medical treatment. So I guess we need to understand whether her therapy qualifies as medical treatment. The question is whether her speech is incidental to conduct. That's what the court said in NIFLA. It said that if there's professional conduct, then speech that's incidental to that could be regulated. So treatment is not conduct, in your view? If the treatment consists only of speech, then it doesn't trigger the speech-incidental-to-conduct doctrine. And here we're just in First Amendment land where there is full, robust protection. That's why I answered the Chief Justice's questions differently and acknowledged that if there was conduct in the practice of medicine going on, it changes the analysis. But I guess it seems very odd that you could have two scenarios where you have two licensed professionals both attempting to provide treatment to an individual, say, for the same issue, that, you know, the person says, I'd like to live consistently with my biological sex. I feel that I'm not doing that. I'd like your help. Medical professional A treats that quote-unquote condition with medication. Medical professional B treats that condition with talk therapy. And I guess under your theory, those two scenarios are sufficiently different from a constitutional perspective that one could be allowed and the other not. I think that's potentially correct because the First Amendment would apply to the speech therapy. Just because words are being used to accomplish the therapy in one scenario and not the other. No, because only words are being used in the one scenario. Again, if there is a combination of words and conduct, I think that takes us into a different realm. But one of the things that's so problematic about Colorado's law is that it undermines the well-being of kids that are struggling with gender dysphoria. And so Colorado accepts that up to 90% of kids who struggle with that before puberty will work their way through it and realign their identity with their sex. But this law says that if any of those children go to a licensed professional and say, I would like help realigning my identity with my sex, that licensed professional has to decline to help them. On the other hand... If the law is not this law, I think Colorado has something like the law I'm going to describe, but I'm not trying to describe Colorado's law. Just take it as my hypothetical. If instead of this law, which really focuses on the kinds of treatment it is and the kinds of goals everybody has, it just says you're subject to penalties if you do any medical treatment, and that includes talk therapy, that deviates from the standard of care. And then it goes on to say something about how we find the standard of care. And suppose that sort of law was applied to your client. Is it the same analysis or a different one? I think it's a similar analysis. So if a law like that were applied against my client and all she did was speak, then I believe that the strict scrutiny analysis would apply and the government would have to satisfy it. But the underlying analysis would change somewhat too because my client under those circumstances would be able to establish that the kind of counseling she provides is consistent with the standard of care versus under the current law she's not able to make that showing. Right, so she is able to make that showing under my hypothetical law, but you're saying still that she would have a kind of separate argument that there needed to be strict scrutiny applied? She would. She would be able to argue that, and that would require the other side to show that what she's doing is causing harm because that ties into what this Court's recognized in cases like Brown under strict scrutiny. Thank you, Counsel. Justice Thomas? Justice Alito? Justice Sotomayor? Counselor, in your introduction, you appeared to be applying strict scrutiny. One of the factors you said is the State has not pointed to a study that shows that talk therapy is harmful. I don't believe strict scrutiny always requires a study. I mean, look, I'll give you a hypothetical. A State tells dieticians don't encourage anorexic patients to engage in more restricted eating. I don't think the State has to provide a study to show that that advice is not sound. Do you agree? Justice Sotomayor, I think that might be true, but that's because that kind of hypothetical is very different than what we have here. So explain the difference. In that hypothetical, the counselor or dietician is telling the client to do something that directly harms their body. In this case, Ms. Childs is trying to help gender dysphoric kids. That begs the question, because there are studies that say that this advice does harm the people emotionally and physically. But putting that aside, you agree, then, that you don't always need a study. An absolute statement like that misstates the law. No, what I agree is that if what the State is getting at is a statement by a professional that's telling someone to harm their body, that that's a different category. But if we're in a situation like this, where there's debated science, where the counselor is trying to help the child achieve their goals, then absolutely the standard this Court said in Brown would apply, which requires a showing of causation. So there's only one circuit that has applied strict scrutiny to this kind of thought therapy. It's the 11th. The others, the 9th and the 3rd, have not. You seem to be encouraging us to apply strict scrutiny here, and the question I have, we're not a court of first review on this issue. Why don't we send it back? I'm assuming that the 3rd and the 9th didn't apply strict scrutiny because they thought they'd have a problem with applying it to this law. Why should we be breaking our normal pattern in this case? Because there is ongoing harm every day. This child is being silenced, and the kids and families who want her help are unable to access it. It's very similar to what this Court did last term in the Mahmood case, where the two lower courts had decided the case on rational basis review, and when this Court decided that strict scrutiny was the proper... Remember, I dissented. I do remember that, Justice Sotomayor. Justice Kagan? Do you think if there were the exact opposite kind of law? So this is a therapist that, consistent with the child's goals, is trying to get the child, you know, to accept a gay identity or a trans identity. So it's exactly the same statute, but it's just flipped around. Same argument? Strict scrutiny would apply to that unless there was conduct involved. If there was conduct and that conduct was unlawful, then the speech integral to unlawful conduct doctrine would apply, but if it's only speech, then yes. I'm assuming that your caveat, unless there was conduct involved, applies to your case as well, right? That that applies symmetrically to both, unless there was conduct involved that was of that kind. That's correct. Okay, so symmetrical. Correct. What do you think, suppose, I mean, you argue in your briefs that this law has viewpoint bias in it, and suppose that that was accepted. Do you think that we should stop there? Is there any reason at that point to go on to say how in this particular context of medical treatment we would treat a content-based law that is not viewpoint-based? I don't think the court needs to address that if it finds that this is viewpoint-based discrimination. It reminds me of the distinction between this court's decision in Brunetti and then in Vidal. In Brunetti, there was viewpoint discrimination, and then when just content discrimination was at issue, the court treated it differently. Thank you. Justice Gorsuch? Just quickly, back to the late-breaking standing argument, which is in, I think, footnote 18 on page 23 of Colorado's brief, and what your client intends to do. As I read the verified complaint, she would, consistent with the patient's wishes, explore changes to not just attraction, behaviors, and expressions, but also identity. Is that correct? That's correct. Okay, so even under Colorado's new reading of the statute, which is only about identity and orientation and not about those other things, even though the statute includes them, even under Colorado's understanding, your client would still wish to counsel people in a way that contravenes Colorado's present understanding of the statute. That's correct. Justice Kavanaugh? Justice Barrett? Justice Jackson? As I understand it, the First Amendment protects the communication of messages, expression, etc. Am I right about that? I mean, you're communicating, and that's what the First Amendment is about. Correct. So I guess I'm still just struggling with whether a therapist who is acting in their professional capacity to help someone achieve their goals is really expressing the kind of message or expressing a message for First Amendment purposes. I mean, I understand if Ms. Childs here were writing an article about conversion therapy or giving a speech about it, but it's just a little puzzling to me that she would stand in a different position than a medical professional who has exactly the same goals, exactly the same interests, and would just be prescribing medication for that rather than her talking with the client. I don't think that they would have exactly the same goals. Why not? Because this involves a conversation. Yes. So this court has recognized many times in cases like McCullen that a one-on-one conversation is a form of speech, and that's exactly what's going on with Ms. Childs and her clients. So when she engages in those conversations, she's encouraging them to achieve their goals. She's discussing concepts of identity and behavior and attractions and how they fit together. This is an ongoing active dialogue where she's helping them to explore their goals, and that absolutely has to be protected by the First Amendment. And you're saying a similar kind of exchange doesn't occur with the provision of other medical services that don't involve talking? It certainly might occur in other instances, but oftentimes there's conduct connected to it. That's what's different about the medical context. And I'm sorry, can I just ask you again what Justice Sotomayor asked, which is, why wouldn't we send this back if you're right about strict scrutiny and let the lower courts apply? Because there is irreparable harm going on right now. Ms. Childs is being silenced. The kids and the families who want this kind of help that she'll offer are being left without any support. I understand, but strict scrutiny is not necessarily fatal, right? We have cases in which strict scrutiny was applied and it was surmounted. So why wouldn't we give the lower courts a chance to evaluate whether there's sufficient evidence here for the state to actually go forward with this regulation? Because we were arguing for strict scrutiny in the trial court, so Colorado knew that was our position, and they had an opportunity to make their record. But the evidence that they submitted and the expert materials both undermine their case. The expert materials admit that they don't have any study addressing precisely what's at issue, or specifically focusing on precisely what's at issue here, which is voluntary conversations between a licensed professional and a minor. Their expert materials also recognize that they cannot prove harm. We've cataloged all the places in their expert materials on page 22 of our reply brief where they concede that. And lastly, their own expert materials recognize that many people have experienced life-changing benefits from this kind of counseling. Again, the APA's own report talks about how this helps people because they're able to align their life with their religion, they're able to find deeper relationships with God, they're able to find... Doesn't Colorado have some evidence that conversion therapy more broadly is harmful? I mean, I think there are like 25 states or something who have similar laws. So someone has some evidence related to the harmfulness of this activity, right? Colorado certainly cites studies, but those studies suffer from significant flaws. The main flaw in all of them is that they lump together dissimilar approaches. They treat voluntary conversations the same as shock therapy. Thank you. Thank you, counsel. Thank you. Mr. Mupan? Mr. Chief Justice, and may it please the Court, Colorado's law is subject to strict scrutiny under the First Amendment for three straightforward reasons. First, the law restricts speech based on content and viewpoint. It prohibits petitioner from counseling minor clients to help change certain feelings and behaviors. It is thus subject to strict scrutiny unless an exception applies. Second, the law falls outside the exception for regulations of conduct that only incidentally burden speech. There is no separate non-speech conduct being regulated here. And professional medical treatment is not exempt from the ordinary First Amendment rule that strict scrutiny applies even to laws that generally regulate conduct where those laws are triggered by the communicative content of speech. Third, the law falls outside any historically grounded exception. There is no longstanding tradition of states imposing this type of categorical prior restraint on the speech of therapists. I welcome this Court's questions. In the context of strict scrutiny, how strong evidence would Colorado have to show in order to prevail? Well, in this case, Your Honor, Colorado has no evidence. I understand that, but hypothetically, what would they have to show? I think for this sort of sweeping categorical prior restraint, I think they would have to have very strong evidence that there was direct harm to patients, no countervailing benefit, along those lines before we could even talk about whether they can meet the very high standards of strict scrutiny. But again, this case is a much easier case because I think counsel will have to concede that if you look at the preliminary injunction record, both the three pieces of evidence that they put in, the Glass-Gold report, the 2009 APA report, and the 2015 SAMHSA report, and all the materials cited therein, none of those, none of them, consider the type of speech at issue here. Speech by a licensed therapist involving non-reversive methods to minors. They just don't have any evidence of that. So certainly that's not enough under strict scrutiny. How does your analysis change if there is an aspect of conduct involved? The same answer, Your Honor. I think that if there is conduct, then the question would be, is the restriction of speech incidental to the conduct or the regulation of the conduct or not? And this Court hasn't drawn a particularly clear line about when speech is close enough to conduct to be viewed as incidental, but here, again, this is an easy case because there is no conduct. All that is happening here is speech. Now, there have been a lot of questions about, well, it's medical treatment, or what if you had a general rule about standard of care? And this Court's cases and cases like Holder and Cohen make clear that that is still speech. In Cohen, for example, breach of peace was a violation of the law. You could breach the peace in the courthouse in California in a lot of different ways. Right, but neither Cohen nor Holder involved medical treatment, right? No, so that's true, but that's just a label, and this Court has also said that labels don't matter in cases like Bunin. There's nothing conceptually different. Take Holder, for example. In Holder, there was a statute that said, don't materially support terrorists. You can materially support terrorists in lots of different ways. You could give them money, you could give them guns, or, as in Holder, you could give them advice about how to commit their acts. I understand, but when you look at the Tenth Circuit's opinion, they talk about how there is a long historical tradition of regulation of medical treatment as a particular thing, the provision of these kinds of therapies. Right, and the problem is the level of generality. There was also a long historical tradition in this country of regulating contempt of court and breach of peace, but what there is not a long history and tradition in this country of doing is regulating contempt of court and breach of peace when it's purely based on speech. And if you look at the history that the other side cites here, what is totally absent is the regulation of medical treatment that consists solely of speech... But does the federal government agree with Justice Kagan's flip-side scenario? So it doesn't matter to you that we're talking about Mrs. Child's form of therapy versus gender-affirming care form of therapy? We do, and in fact, we think that's a strong reason in support of our position. Colorado's position, I think, inevitably leads to the conclusion that all the states, and for many, could have not only banned things like cross-sex hormones and prescription blockers, puberty blockers, but also therapy, talk therapy along the same lines. Even starker, in the 1970s, it was the standard of care, professional consensus, that being gay was a mental illness. So on their position, a state in the 1970s could have made it illegal for a therapist in the state to counsel a gay patient that they weren't mentally ill. That just cannot be right under the First Amendment. Can you address Justice Sotomayor's question from before about whether we should apply strict scrutiny, assuming we think it applies here, or remand it to the Tenth Circuit to do so? What does the United States want to say about that? So you could remand, but we think, like in Mahmoud, this is a case where it would be probably fairly appropriate to actually just resolve the case here. And for two reasons. One is there is ongoing irreparable harm to the petitioner because of the restriction of their speech. And the second is the evidentiary record here is totally clear that they can't satisfy strict scrutiny. If you look at the record on what's in the preliminary injunction record, there is just no evidence that this type of speech, not aversive therapy, not speech by non-licensed professionals, not speech to adults, but speech to minors by licensed therapists.  Steve, you have just last point, last question from me. Standing, what's your position on the late-breaking standing argument? So precisely because it's late-breaking, first of all, I think the most important thing is it's mootness, not standing. The question is whether there was a credible threat of enforcement for standing purposes. There clearly was, because as counsel said, if you match up paragraph 87 of the complaint with the statute, the conduct that petitioner wanted to engage in is clearly covered by the plain text of the statute. And most were talking about mootness because the government has come in now and suggested that somehow the plain text of the statute doesn't apply or they're not going to enforce the statute despite that. And we don't think that in these circumstances, when the state comes in post-Certiorari and advances a fairly implausible reading of their statute, that that should be enough to defeat standing. If I could say one more thing about how implausible their reading is, as I understand their position, it seems to be that the language after including isn't independently sufficient. You have to be trying to change behavior orientation independently. If that was true, it would equally apply to aversive therapy. So if someone went into a therapist's office and said, I don't want to be gay anymore, I don't want to engage in same-sex conduct, if the therapist said, look, I can't change your orientation, but I can try to change your behavior and I'm going to use electroshock therapy, according to the state, as I understand their position, they seem to be saying that that's not covered by their statute. I find that awfully hard to believe. And that just sort of underscores how implausible their reading of the statute is and perhaps why it showed up on footnote 18 after the court granted cert. Thank you, counsel. Justice Collins, anything further? Justice Alito? If we thought that this statute engages in viewpoint discrimination, does that have a bearing on whether we should decide whether it satisfies the applicable constitutional standard or remand the case? I think it makes it even clearer why it fails strict scrutiny, but I think even as a content-based restriction, it pretty clearly fails strict scrutiny. Thank you. Justice Sotomayor? We keep going back to the question of the studies and what's the strongest tick-off? The thing that gives me pause in not applying strict scrutiny or in applying it is that none of the studies say that talk therapy is harmful. Is that correct? And Colorado? For this type, for talk therapy by a licensed therapist to minors, they don't have any studies that say that that is either harmful or ineffective. And indeed, they often concede that they don't have that. The 2009 APA report expressly acknowledges at pages JA-221 and 256 expressly acknowledges that they don't have evidence of that. And if you look at the Glasgow Declaration, which is after 2009, she, too, doesn't cite anything. If you look at the studies that she cites in her declaration, all of them are conflating either aversive and non-aversive or licensed and non-licensed or minors or adults. They just don't have anything. And this comes up to the Court after a PI hearing. And if strict scrutiny applies, they bore the burden and they just don't have anything. Thank you. Justice Kagan? You have an evocative example in your brief, which I want to pick up on, which is let's say there's a school of psychotherapists that say that think that the best way to deal with suicidal patients is to go dare them to commit suicide. And you basically say, yes, strict scrutiny applies, but don't worry, it could be satisfied in a case like that. And I just want you to run through that and tell me why you think strict scrutiny applies and why you're confident that it could come out the way you think. So I'll say a couple things about that, Your Honor. First, we think strict scrutiny applies if the law is structured the way this law is. So if it was a categorical prior restraint. We think strict scrutiny applies because it's content-based, it's not incidental to any conduct, and there isn't any history or tradition of imposing that sort of prior restraint. So we think you're in strict scrutiny. As to why we think you could satisfy strict scrutiny, because that type of speech has utterly no redeeming value. It may be the type of speech where you don't even need to study because it's so obviously harmful. There's no real value. Is that the right analysis? I mean, when I think about Brown, which I found one of the most difficult cases that I've ever encountered on this court, you know, we really did insist, no, you need to have studies. You need to have a kind of scientific showing of causation rather than rely on your intuitions that, of course, this causes harm. And why wouldn't that be true in a case like this? And if it's not true, if you're right, are we basically diluting our strict scrutiny standard in a way that will come back to haunt us elsewhere? So I guess what I would say is this, Your Honor. If you were not confident in your judgment, then you probably should require studies. But if you were confident, and I think on a case like that you probably should be, it would be enough. But what I absolutely agree with is that you should not dilute strict scrutiny. It's important that strict scrutiny retain its rigor where it applies, but it's also important, as this court held in NIFLA, not to create additional exceptions to the general rule that content-based restrictions are subject to strict scrutiny. And if you take a step back, the other side just doesn't have any doctrinal or historical basis for getting this out of strict scrutiny. They can't say it's conduct because there is no conduct. They can't say it's history because there is no relevant history. All of their arguments would blow a massive hole in this court's case law, emphasizing that its treatment is inconsistent with Holder and Cohen, which says that the fact that you could point to some other law that generally regulates conduct isn't enough if the particular speech is what's triggering that content-based restriction. Thank you. Justice Gorsuch? Justice Kagan's hypothetical. Could you point to a long history against assisting suicides? You could, but whether there's a long history of speech related to that, especially in a context where the speech, if suicide was unlawful. There have been convictions for counseling people to commit suicide and encourage them to do so and maybe providing a substantial step toward... Those have been all over the books for hundreds of years. It's true. It's a little trickier because I don't want to... I agree with you that that's a potential additional argument the state could make. I wouldn't want to leap to that because it would turn on things like... Speech versus conduct. Is suicide prohibited so it's unlawful conduct? No, it's not. It's not, but assisting is in most states. Right, but then it's a little bit harder to say it's speech incidental for regulated conduct. I follow you. Even if suicide is illegal, the degree of connection, it's the incitement question under cases like Brandon's. It essentially becomes an incitement. Exactly. And that is illegal. Yeah, and I did want to make one other point to Justice Kagan, which is I think another way of thinking about this, her question was about ex ante categorical prior restraints, but often this sort of speech is quite easy after the fact malpractice. But I would like to say a couple of things about malpractice because I think malpractice presents very different types of questions than this sort of law. Prior restraints. Yes, for three reasons. So the first reason is often malpractice is incidental to conduct. It's speech that's restricted tied to some conduct. The second is, as Your Honor just noted, this is a prior restraint and this Court has recognized in a lot of cases like Florida Star and NTEU and Madigan that for First Amendment purposes it's very important the difference between letting someone speak and then adjudicating individually that speech after the fact rather than categorically banning it ex ante. And the third and related point is as a matter of history and tradition we have a long history and tradition in this country of malpractice. Now, how that history and tradition cashes out for this type of speech is a tougher question to be candid. But what is not a tough question is there is no history and tradition for this sort of prior restraint. Thank you. Justice Kavanaugh? Justice Barrett? Justice Jackson? Can I ask you about licensing? You talked a lot about malpractice. But don't states tend to tie licensing requirements to the standard of care? And so if we had a situation like this in which a state licensing board disciplined a doctor for a speech-based practice outside of the standard of care, would that doctor have a license to do a First Amendment defense? So there is a long history and tradition in this country of licensing and even licensing for people who engage in speech. What there isn't a long history and tradition of is as a condition of that license imposing a prior restraint on the types of speech they engage in. And we know from NIFLA that the mere fact that there's a license isn't enough to obviate First Amendment review. Obviously the whole point of NIFLA, it was regulated NIFLA was a notice scenario, right? For a licensed clinic. No, I understand, but it wasn't connected to the provision of services to particular people. That was part of the analysis. And so I guess what I'm saying is a doctor who's providing services pursuant to a state license, I'm just trying to understand how the First Amendment protects that doctor from providing therapy that is outside the standard of care. Well, because in NIFLA itself, the court made clear that part of the reason it was rejecting a professional speech exception is because it was very worried about the risk of the state interfering with the doctor-patient discourse. And it gave us an example how in certain authoritarian governments, they do things like tell doctors you can't tell patients about birth control. Those people are all licensed. And so if there was some sort of argument that because you're licensed, all of a sudden the state can tell you what to say and what not to say to your patients, those very harms, the precise harms that NIFLA put through could happen. Can I ask you just one final question, just sort of from a very broad perspective? I'm wondering why this regulation at issue here isn't really just the functional equivalent of SCRMETI. I mean, I realize that there were two different constitutional provisions at issue, but the regulations work in basically the same way, and the question of scrutiny applies in both contexts. So it just seems odd to me that we might have a different result here. Well, SCRMETI was a law that regulated on the basis of age and medical treatment. No, but here's what I mean, right? In SCRMETI, we had a state that wanted to prohibit certain medical treatment, gender-affirming care, being given to minors in the form of medication. And we said that was okay, and I understand there are particulars with respect to how the arguments, the constitutional provisions can prohibit that. Here we have a state that wants to prohibit gender-related medical treatment in the form of talk therapy, but we now have the First Amendment that is inhibiting the state's ability to do that. And I'm just, from a very, very broad perspective, concerned about making sure that we have equivalence with respect to these things. Well, from a very broad perspective, there shouldn't be equivalence, because obviously you have a First Amendment. Because talk therapy, the speech is what is at the core for you. Right. It's not necessarily the state's interest in protecting minors from what it believes to be certain harmful treatments. Just like in Holder, the state had a very compelling interest in stopping material support of terrorism. But when you stop terrorism through speech versus from conduct, the analysis is different. All right. Thank you. Thank you, Counsel. Ms. Stevenson? Mr. Chief Justice, and may it please the Court. Throughout its history, this Court has recognized that state power is at its apex when it regulates to ensure safety in the health care professions. Colorado's law lies at the bullseye center of this protection, because it prohibits licensed professionals from performing one specific treatment, because that treatment does not work and carries great risk of harm. No Court has ever held that a law like this implicates the First Amendment, and for good reason. First, the law applies only to treatments. That is, only when a licensed professional is delivering clinical care to an individual patient. In that setting, providers have a duty to act in their patient's best interest and according to their professional standards. The First Amendment affords no exception. Second, because this law governs only treatments, it does not interfere with any First Amendment interest. It does not stop a professional from expressing any viewpoint about that treatment to their patient or to anyone else. And because Colorado's law regulates treatments only and because it enforces the professional standard of care, the law thaws squarely into the reasonable regulation of professional conduct that does not trigger First Amendment scrutiny. Petitioner's argument, on the other hand, cannot be reconciled with history, precedent, or common sense. A state cannot lose its power to regulate the very professionals that it licenses just because they are using words. A health care provider cannot be free to violate the standard of care just because they are using words. And a state cannot be required to let its vulnerable young people waste their time and money on an ineffective, harmful treatment just because that treatment is delivered through words. Petitioner asks you to enjoin a bipartisan law passed by 25 different states, but she did not put one single piece of evidence into the record. Not a single expert, not a single study, not a single mental health professional willing to endorse conversion therapy. And there is a mountain of evidence to the contrary. On this record, we request that you affirm the denial of preliminary injunction. I welcome your questions. If Petitioner were a non-therapist, would this be protective speech? Well, so I wanted to mention our law covers physicians as well. They are also subject to the conversion therapy ban. But if you're talking about a non-professional, I think it would. Our argument is premised on the notion that there is a special relationship between a health care provider and a patient where that patient is in a position of vulnerability and dependency on the health care provider, and the health care provider owes fiduciary duties to act in that patient's best interest only. In Colorado, are there only health care providers who provide this sort of service? No. I don't know factually if there are, but the law exempts religious ministers and ministries from this, and there is also a group of people called life coaches who could perform this therapy. So what exactly transforms speech in that context to speech that is protected in that context to speech that is not in the therapist's context? It is the relationship between a health care provider and the patient that establishes this special context. And again, if you go to a life coach or you go to someone else, they're not licensed by the state. You're not expecting them to be complying with standards of care. You have a different expectation. When you're going to see a licensed health care professional who owes you fiduciary duties, your expectations are different. You're expecting information that is complying with the standard of care and not expecting the practitioner to just be exercising their right to say whatever they want to say. And that's just materially different, and it's always been treated so. So what if someone happened to be devoutly religious and actually relied more on the minister than the therapist? It would seem that that person would be equally dangerous. Well, I think that that would be a personal choice that they were making to rely on their religious minister It wouldn't be a representation from the state that this is a licensed professional who we are holding to a certain standard of care. And so that expectation, at least vis-a-vis the state license, would matter a lot. And in addition, the religious minister, as a legal matter, doesn't owe fiduciary duties in the same way that a health care practitioner does. Counsel, you said just because they're using words. But our cases separate those out. In other words, just because they're engaged in conduct doesn't mean that their words aren't protected. So, Chief Justice, our case is absolutely premised on the notion that communications that are happening in the very specific context of treatment, which I will call a licensed professional delivering clinical care to an individual patient, where they are subject to fiduciary duties and subject to malpractice, that that is a fundamentally different regulation than a regulation of people out in the world going about their business, like at Issue and Holder, where you have generally applicable statutes that apply to everyone. This is just a fundamentally different relationship. It has always been treated like that. In NIFLA, the court talked about the fact that longstanding torts for malpractice did not implicate heightened First Amendment scrutiny. And I think that analysis is exactly the same here. Malpractice, you're dealing with that same individualized relationship, and this is the exact same context. Ms. Stephenson, I want to ask you the mirror, what Justice Kagan called the mirror image question, and Mr. Lupon and Judge Hart's example about homosexuality in the 1970s was professionally considered to be a mental health disorder. What if a state back then might have passed a law prohibiting talk therapy that affirmed homosexuality? Would that be subject to rational basis review on your theory? So, Your Honor, what our theory depends on is that there is a treatment being provided that's being regulated and that the regulation is consistent with the standard of care. Let's check both of those boxes in our hypothetical. Then yes, and I want to return to Justice Jackson's point because they could regulate. A state could forbid a regulated licensed professional from affirming homosexuality if that were consistent with the then prevailing standard of care. That's right. And so likewise, if the prevailing standard of care were to change or to solidify that this sort of talk therapy is beneficial to minors or at least not harmful to minors, then a state could pass a mirror image statute to Colorados that prohibits any attempt to affirm changes of gender identity or sexual orientation, and that would be subject to mere rational basis review on your theory. That's right, Your Honor. And just to illustrate, the fact that there are words involved doesn't make a difference. So states like we recognized in Scrimeti have the power to regulate even in the face of medical uncertainty. The standard of care could change there, and the legislature can act to change that. So even in cases where medical uncertainty exists, do you think that a state could pass such a law prohibiting ex ante speech that would affirm gender identity changes or sexual orientation changes or homosexuality? I don't think you'd have to reach that question in this case. I'm asking about the logic of your argument. I think you just said states can regulate even in the absence of medical consensus in this fashion. Is that right? Where there are no words involved and no First Amendment issue raised. We're talking about speech, and we're talking about talk therapy. That's what I want to get at. And I think you're saying that if there's medical consensus, states surely could pass mere image laws. And I think you're saying, but I want to make sure, that even in cases where there's medical uncertainty, states could still regulate. You could reach a holding in this case that said, yes, treatment is treatment, and it doesn't matter whether it's consistent with the standard of care or not. We would urge you to reach a narrower holding in this case. I understand that, but I'm asking you to answer my question. Could a state, when there's medical uncertainty, and we normally provide, this court has many times said, when there's medical uncertainty, we defer to state judgments. And I think you're saying that yes, I think the logic of your position has to be yes. I'll let you go as soon as you give me an answer or down on the state of medical uncertainty and whether they could pass mere image laws. I think it's less clear that that fits into the historical tradition identified in NIFLA that calls specifically out malpractice, which is an enforcement of the standard of care. And while that question could come up on another day here, where we meet the standard of care, we don't think we can reach it. It's pretty important to think about how this would apply to cases down the road. So let me describe medical uncertainty as competing medical views. And let's say that you have some medical experts that think gender-affirming care should be, is dangerous to children, and some that say that this kind of conversion talk therapy is dangerous. Can a state pick a side? So it's not, I want to be very clear, it's not that the medical community says we just don't know. It's that there are competing strands. In some states, like say Tennessee, which was the state of issue in Scrimedi, pick one side, Colorado picks another side. Your position is that rational basis applies? Our position in this case is that the standard of care is important. It's important because that's been the historical tradition. But like Justice Gorsuch said, just answer that question. No, our view is that that would not be the right rule here. One, because that's not consistent with the history and tradition identified in NIFLA. And two, because the reason why that history is important and the reason why the standard of care is important is because it's a confirmation that the state is not actually trying to shut down viewpoints. Okay, I'm not understanding why the standard of care, maybe I'm not following you. Are you saying that the standard of care, why do you think the standard of care question isn't relevant there? Because wouldn't that be a situation in which Colorado was essentially saying that the standard of care, we're essentially looking at expert evidence and saying that we think this is what's appropriate, that we shouldn't have this kind of talk therapy. And Tennessee is choosing a different one as a matter of its state law. Am I not understanding that correctly? What I'm saying is where there is a First Amendment issue raised and the state can show we're regulating a treatment and we're regulating consistent with the standard of care, there is a confirmation of security that the court can have that there is no other motive going on to suppress viewpoints or expression. And that's what's consistent with... So Colorado's law would trigger a rational basis, but Tennessee's hypothetical law would be strict scrutiny. If it were against the standard of care. So there's no mirror image. Counsel, can you define standard of care to help us? Is the standard of care a medical consensus about what should happen in the situation? It's the same standard of care that would apply in a malpractice case, yes. So it's not a situation in which you have competing doctors and there isn't a consensus on what is supposed to happen. Correct. No, but I think you could have that. In my hypothetical, I'm saying that there might be a dispute in the medical community is my hypothetical, where you have some experts saying that this should be the standard of care and others saying something different. That was the hypothetical. Well, the question would be, is the regulation enforcing the existing standard of care? And you're describing a situation where it sounds like there would be many viable options under a standard of care? Yeah. Right. And so in that instance, I think that would raise more significant questions if there were actual multiple procedures, treatments available that all met the standard of care. And again, this is just a question that would be resolved exactly the same as it would be in a malpractice case where you could have competing experts as well and we'll decide is this thing inside or outside the standard of care. If Petitioner could put on an expert to show conversion therapy is inside the standard of care, then I think we wouldn't be here. That would be a different standard to apply to our law. I have a question about how you're distinguishing Holder. It was a generalized law against providing material support to terrorists, but you seem to be suggesting that if there was a Bar Association rule that said it's a breach of your duty as a lawyer if you tell terrorists how they can break the law, that that would be subject to rational basis review. So I think that, again, the critical aspect of the relationship is that there is a duty between the professional and the receiver of the professional services. And it sounds like in the law that you're describing, Justice Sotomayor, there would be laws passed for some other interest than to protect the client in that case, and I think that's materially different. When we're talking about a special relationship where the client is depending on the expertise and training of the lawyer... But I'm just not sure why that makes a difference. If we're talking about the speech aspects of it, why that becomes any less protected. It's because that's how we've always treated speech, especially in the health care context, between providers and patients. This has been an area that has been heavily regulated from the beginning of our country, and no one has ever suggested that a doctor has a First Amendment defense to say the wrong advice to their patient. And just to give an example on this speech conduct distinction, if I went to my doctor and had high cholesterol, she could tell me a number of things. She could say, come back next year. She could say, eat less red meat. She could say, I'm going to prescribe you a statin. Or she could say, you need an arterial stent. And whichever way she violated the standard of care and making a wrong judgment there could be equally harmful to me. And so I don't see how you can parse out whether there is conduct involved in terms of when you're talking about professional services delivered in a fiduciary relationship where the client or the patient is expecting accurate information and information delivered to benefit their health. I don't really see a difference between the argument that you're making now and the argument that I thought we rejected in NIFLA, that professional speech is a special category that's outside normal First Amendment scrutiny. But let me put that aside and ask about your interpretation of the statute at this stage in the litigation. And let me give you this example. Suppose an adolescent male comes to a licensed therapist and says he is attracted to other males but feels uneasy and guilty about those feelings and he wants to end or lessen them and asks for the therapist's help in doing so. Under your interpretation of the statute, is that banned? So, Your Honor, our interpretation of the statute turns entirely on whether the purpose of the therapy is to change the person's sexual orientation or gender identity. What is the answer to my question? Is that banned or is it not banned? If the therapist told him or he asked, can you help me become straight, the answer would be it would be banned. If it was can you help me cope with my feelings as to how I am and how I want to live my life, that's permitted. Why doesn't the situation that I've just described fall squarely within the terms of the statute, which says that conversion therapy includes, quote, If those things are undertaken with the purpose of changing orientation or identity, then they violate the statute. But that's not what your statute says. This is the way we've interpreted the statute from the beginning of this case. It's the way both of the lower courts interpreted the statute. It's the way every state that has this statute interprets it. And the reason why is because the harms from conversion therapy come from when you tell a young person you can change this innate thing about yourself. And they try and they try and they fail and then they have shame and they're miserable and then it ruins their relationships with their family. Well, I know, I understand. This is where the harm comes from. I understand all of those arguments. What I don't understand is how you can square your interpretation with the plain meaning of the statute. Are you suggesting that everything beginning with the word including is irrelevant? You just want all of that deleted from the statute? No, it's illustrative. And so, for example, one of the ways that people try to engage in conversion therapy would be by saying, look, you need to start dressing like a boy and then that will make you change your gender identity. That's a way you could go about that. But if the minor wants to start dressing like a boy to match his gender identity, not because he thinks it's going to change. That's just not the way language works. Suppose that there's a sign, there's a rule that says you may not bring any dangerous animals in the park, including pit bulls. Doesn't that definitively provide you can't bring a pit bull into the park? Yes, because a pit bull is a subsidiary of a dangerous animal, but I don't think you can read an including to contradict the anchor term. So here, conversion therapy is an effort to change orientation or identity. If you read it to not mean that, then you've ruined that part of the statute. I'm sorry, go ahead. I was just going to say I can't say I like meat, including tomatoes and celery. That doesn't make any sense, and that's how we read the statute. And again, I've consistently read the statute that way from the beginning of this case in every pleading that we filed. If you recall the example that I gave you, I'll give it to you again, because I want to contrast it with another situation. So in the first situation, an adolescent male comes to a licensed therapist and says he's attracted to other males, but he feels uneasy and guilty about those feelings. He wants to end or lessen them, and he asks for the therapist's help in doing so. The other situation is a similar adolescent male comes to a licensed therapist, says he's attracted to other males, feels uneasy and guilty about those feelings, and he wants the therapist's help so he will feel comfortable as a gay young man. It seems to me your statute dictates opposite results in those two situations based on the viewpoint expressed. One viewpoint is the viewpoint that a minor should be able to obtain talk therapy to overcome same-sex attraction, if that's what he or she wants, and the other is the viewpoint that the minor should not be able to obtain talk therapy to overcome same-sex attraction, even if that is what he or she wants. It looks like blatant viewpoint discrimination. As I heard your examples, I think they would both be permissible because it didn't sound like in either case the goal was to actually change sexual orientation. And again, that's the touchstone because that's where the harms come from. And if there is no goal being reached... I guess I had the same kind of question that Justice Alito had. I mean, if we assume, for example, and this is a big assumption on your part, but just assume that we're in normal free speech land rather than in this kind of doctor land. And if a doctor says, I know you identify as gay and I'm going to help you accept that, and another doctor says, I know you identify as gay and I'm going to help you to change that, and one of those is permissible and the other is not, that seems like viewpoint discrimination in the way we would normally understand viewpoint discrimination. I don't disagree with that, Justice Kagan, and that's why medical treatment has to be treated differently. Because any time you exclude one harmful practice, you are by definition saying these things are allowed because they are not harmful and these things are excluded because they are harmful. That's the driving force behind regulating the particular practice. Let me ask you about the standing argument. There's a statute on books and if it prohibits what the petitioner wants to do, why doesn't she have standing? Why is it an answer, well, we haven't prosecuted her or anybody else under this statute? I think it would if she said that she wanted to do something that violated the statute. And I think there's just been an ambiguity that has persisted in this case. What I can say is if she does not want to engage in a therapy for the purpose of changing a minor's sexual orientation or gender identity, then she is not violating the statute. Both the district court, which ruled for you, found standing, and the Tenth Circuit, which ruled for you, found standing. And you didn't cross-appeal on those, not that you had to, it's standing. You didn't even put a Roman numeral in your brief on it, or even a subsection. It's footnote 18 on page 23. That doesn't exactly suggest that you have great confidence in that argument, does it? Well, we recognize we lost it twice. And again, it is the petitioner's burden, and it has been a persistent issue in the case, I think, in defining exactly what it is she wants to do. And to come back to this conduct point... But if she does, consistent with a patient's, by reading the verified complaint, if I understand that to mean, paragraph 86, 87, that she wishes to help clients who voluntarily come and with the desire to change their behaviors, expressions, attractions, and identity, then that would give her standing, wouldn't it? Identity, yes. Only identity. The other's not. The other's not because of your peculiar reading of the statute. But identity would. That would give her standing. The change in sexual orientation or identity is the key to... And that would give her standing. That would. Okay. Because you're not disavowing that. No. Okay. So that settles the standing question. Thank you, Counsel. Justice Thomas, anything further? You rely on the history of regulating the medical profession quite a bit. What's the history of regulating therapists? When did that begin? Right. So I would say mental health and health care were delivered through words. Those were in full force at the founding of this country. At the time, that was done by people you might call physicians. And all of their practice was pretty much carried out through words and giving advice. As time went on and specialties developed further and the mental health profession sort of came into existence, those same standards applied and governed psychologists and therapists. And then I would say the licensing of counselors as other professionals in the mental health field was sort of the second half of the 1900s. With respect to this type of regulation that is a prior restraint on speech, what was the first example of that? So, Justice Thomas, I want to push back on the notion that this is a prior restraint on speech. There's no enforcement of this law unless somebody files a complaint with Petitioner's Licensing Board and she has an adjudicatory hearing and opportunity for judicial review and all those things. So it's like many other statutes in that way. It simply calls out a specific practice that violates the standard of care. And those types of statutes have been around for a very long time. In the late 1800s, those types of statutes governed medical professionals and then have been added over time as the mental health profession has developed and govern mental health professionals in every state. Justice Alito, your argument depends very heavily on the standard of care, which I take it is defined by a medical consensus. Is that correct? That's correct. Had there been a case... I mean, the medical consensus is usually very reasonable and it's very important, but have there been times when the medical consensus has been politicized, has been taken over by ideology? We have no facts about that in this case, but I wouldn't disagree that that's possible. Isn't it a fact that it's happened in the past? Three generations of idiots are enough? I think that's certainly a concern, and if there were evidence of that in the record as to whether or not there were a standard of care that wasn't really based on patient safety, that would be highly relevant evidence. Well, isn't that a reason to apply First Amendment scrutiny when what is being regulated is pure speech and not just saying medical standard of care, medical consensus? That's the end of the day. Rational basis review, anything goes. No, Your Honor, because again, when we're talking about words used to deliver medical treatment, those issues are the same whether you're talking about words being used or whether you're talking about medical practices that don't involve words. Those issues are the exact same, and there is nothing about this statute, for example, that stops anyone from sharing any opinion about conversion therapy or about how the consensus on that was reached, and again, in this case, there is just no evidence of any motive by either the Colorado legislature or any medical association to reach this conclusion based on anything other than protection of minors and a decades-long record of research. Was there a time when many medical professionals thought that certain people should not be permitted to procreate because they had low IQs? I don't know that, but I will accept the premise. Was there a time when there were many medical professionals who thought that every child born with Down syndrome should be immediately put in an institution? I don't know that, Your Honor. Thank you. Justice O'Meara? Justice Kagan? I could go back to your example about having high cholesterol and all the various things that a doctor could say, and I don't think anybody wants to remove doctors from liability or any kind of professional sanction for giving utterly wrong medical advice just because the given of that advice involves words, right? So if the doctor said, you can lower your cholesterol by going out and eating dessert every meal, we would think that was not a good thing for a doctor to say, and we wouldn't say, oh, the First Amendment has something to do with this. But I guess I have this feeling that that's a different kind of case, that that is a case where the speech is incidental to whatever conduct it is that the doctor is offering, whether it's you should take this pill or you should do these eating practices or so forth and so on. And are you saying that there's no distinction between what we're dealing with here and the range of things that a doctor can tell you in her office about what kind of care is appropriate for any particular condition? I don't think there's any distinction because just like in the medical field, counseling is an evidence-based practice that petitioner trained for thousands of hours to be qualified to do, and her advice and counseling therapies through her words can be extremely harmful. And so there is no difference between that and the medical context. And I wanted to come back to the first part of your question about calling out a specific practice that violates the standard of care. This is the thing that legislatures do, not irregularly, when you have a practice that although it's ineffective or although it's harmful, it persists anyway. So for example, in Colorado, there's a specific provision that says it's unprofessional conduct for medical doctors to prescribe anabolic steroids for sports performance. Now normally something like that might die out, but you can understand why there are cultural pressures that make this continue to be interesting to people even when they know there's harm. And this has been the problem with conversion therapy. Although every theory that it's relied on has been debunked and debunked and debunked, people continue to seek it and to want it and to believe that they can make this change. And I think that's understandable. It's a challenge to find out that you're a gay or transgender person. And then finally, to the issue of regulating a specific practice, we cited you a couple of cases about this false memory recovery. So there was a practice going on with psychotherapists in the 1990s where they were using a therapy that was causing children to come up with false memories of sexual abuse. And there were several malpractice cases about it. That therapy died out on its own. But if it hadn't, and therapists had continued to do it, and again, it was done only with words, surely a state could step in and say, that's unprofessional conduct. And that's exactly what Colorado and 25 other states have done here. Thank you. Ms. Gorsuch? Ms. Cameron? Justice Barrett? What is your best evidence on this record, thinking about the application of strict scrutiny, that this kind of talk therapy by a licensed professional, licensed therapist to minors, causes harm? Sure. I would direct you, Your Honor, to JA 64 through 74. And I do want to note, this particular argument about this specific study came up for the first time And I think, had we had an opportunity, we could absolutely have put in even more evidence to nail this down in the district court. But if you look there, our expert walks through all of the research that's been done since 2009. Aversive practices have not been in use since the 1980s or before. So all of these studies do not concern aversive practices at all. And then I would direct you specifically to the Green Study and the Turbin Study. The Green Study looked at 34,000 13 to 25-year-olds who had gone through conversion therapy and, after controlling for other factors, found there was a two-times rate of attempted suicides among that group. And in the Turbin Study, Dr. Turbin looked at 27,000 participants. This was specifically on gender identity change efforts, including people who had received those efforts under the age of 10. He looked specifically at childhood exposure and found association with adverse mental health outcomes in adulthood, including suicide ideation and attempts. You know, this question about whether it's voluntary or not, that's just not an issue that has ever been raised to focus on, and, you know, especially with children under 10, I don't even know how you would assess that. I would also direct you to Dr. Turbin's amethyst brief, though, where he further describes the techniques that he used in his study to show how much they would align, what petitioner would imagine that she would want to try to do. And then you have to put it in the context of people have been trying to do conversion therapy for 100 years with no record of success. There is no study, despite the fact that people tried to advance this practice, that has ever shown that it has any chance of being efficacious. And, again, the harm from it comes not from the aversive practice. It comes from telling someone, there's something innate about yourself you can change, and then you spend all kinds of time and effort trying to do that, and you fail. But you bore the burden. She didn't have to show that it was efficacious, right? You had to show that it caused harm. Right, but in light of 100 years of studies that all point in the same direction with no efficaciousness and evidence of significant risk of harm, we think we amply carried that burden. How many more you said that in the Tenth Circuit you wished, because if you had been back before the district court, you could have introduced more evidence? Did you not? It was a PI hearing. Why didn't you have the opportunity to introduce all the evidence you wanted to? There was no hearing. We filed a response in response to Petitioner's Brief where she had no evidence. We put in a 60-page expert declaration covering all of this, and including not just the studies but the fact that all of the theories underlying conversion therapy have been debunked. Initially, it was homosexuality is the pathology that we need to treat. That's been debunked. Then it was homosexuality is caused by trauma. That's been debunked. Then it was homosexuality is caused by a relationship you have with your parents. That's been debunked. It's on a very specific evidentiary question. Are you representing then that if this went back, you want the opportunity to have a hearing to put in different evidence that it causes harm? I think if there's some argument that we need to show that these studies were done on people who engaged in voluntary therapy, I think you could potentially go to the study authors and get that, but that particular critique was never raised. Again, I just think if what Petitioner is saying is you have to have a randomized controlled trial on children in order to establish, with respect to the particular thing that she wants to do, that would be, I think, a study that would, not even medicine would require a study like that to come up with a standard of care. Justice Jackson? Can I just quickly get you to address Justice Alito's question about how you distinguish NIFLA? You have definitely focused very clearly on the special relationship, the professional context, and the fact that this is medical care being provided in a counseling relationship. But as Justice Alito points out, we have addressed professional speech and the extent to which it should be treated differently and has said no. So how do you distinguish that case? So professional speech, as it was addressed in NIFLA, is a much broader category than what we're talking about here. It would include things professionals are saying in any professional capacity. We are focused on the very narrow context where a healthcare provider is delivering healthcare to a patient. They are under fiduciary duties to act in that patient's best interest and they are subject to malpractice liability, and that is just a different category. So you're saying that this is a very narrow carve-out, no matter what we sort of said otherwise with respect to professional, that you'd be advocating for a very narrow rule here? Yes, it would be very narrow, and I think it's consistent with the precise doctrines that NIFLA called out as not triggering heightened First Amendment scrutiny like malpractice, like informed consent, because those are things that are taking place in the exact same relationship that we're talking about here. Thank you. Thank you, Counsel. Mr. Campbell? Thank you, Mr. Chief Justice. On standing, Justice Gorsuch, in response to your question, I heard the state say that they are not disavowing enforcement, particularly if the effort involves discussions that seek change on identity. On pages 216 to 217, Ms. Childs talks about how she wants to have full conversations exploring issues of identity and gender, and that includes considering change. On the issue of studies, there was a reference to the Green and Turbin studies. All of those studies relied on biased sampling, self-reporting. They conflated aversive techniques with voluntary counseling. They did not isolate licensed counselors and they did not purport even in their own study to prove causation. Beyond that, Justice Thomas, in response to one of your questions, the state conceded that it would be speech if it was a life coach, but it's for some reason not protected speech if it is a professional. That is an attempt to revive the professional speech doctrine that this court rejected in NIFLA. This law's viewpoint discrimination is even worse than we've heard so far this morning because the state of Colorado would allow a 12-year-old without their parents' consent to enter into counseling that would go the opposite way on these issues of gender identity and sexual orientation, but if that same 12-year-old with their parents' consent want to seek counseling in the opposite direction, the kind that my client would provide, they are not able to do that. That kind of viewpoint discrimination must survive strict scrutiny. This law harms gender dysphoric kids because the statistics that we've cited in our verified complaint as well as in the brief that we cited with this court indicate that 90% of young people who are struggling with gender dysphoria before puberty work their way through it and realign their identity with their sex, but if one of those children go to a counselor and they specifically say, that is the help I want, realigning my identity with their sex, they cannot receive that help from someone like my client. Moreover, if they're continuing down the path of transition, then unfortunately they get locked into that path and eventually it leads over 90% of the time, once they start down the path of social transition, it will lead to the route of medicalized transition, which the catch report tells us comes with a lot of harm and devastation. And lastly, there should be no remand in this case for all of the reasons that I just explained. In addition to that, I heard Ms. Stephenson say that they were aware below that we were arguing for strict scrutiny and that they had an opportunity to put studies in. So all remand would do in this case is continue to prolong the ongoing harm that's happening not only to my client, but more importantly, the kids who are struggling with gender dysphoria. Thank you, counsel. The case is submitted.